**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq.
205 E Main St, Suite 3-2
Huntington, NY 11743
(914) 552-2669
tim@talegalgroup.com
*Co- Counsel for Plaintiff Alexa Gonzalez*

**BROWN KWON & LAM LLP**
William M. Brown, Esq.
521 Fifth Avenue, 17th Floor
New York, NY 10175
(718) 971-0326
wbrown@bkllawyers.com
*Co-Counsel for Plaintiff Alexa Gonzalez*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXA GONZALEZ,<br><br>Plaintiff,<br><br>- against -<br><br>WIPRO LIMITED, WIPRO, INC.,<br>and KENNETH OPPENHEIMER,<br><br>Defendants, | Case No.:<br><br><br>**COMPLAINT**<br><br><br>**Jury Trial Demanded** |

Plaintiff, Alexa Gonzalez ("Plaintiff" or "Ms. Gonzalez"), through her undersigned counsel, hereby files this Complaint ("Complaint") for sexual harassment, sexual assault, gender discrimination, retaliation, hostile work environment, and negligent supervision and retention against Defendants, Wipro Limited and Wipro, Inc. (together, "Wipro") and Kenneth Oppenheimer ("Oppenheimer" and with Wipro, "Defendants").

1

## INTRODUCTION

1.    This case is brought to hold Wipro and Mr. Oppenheimer – a leading global information technology company and one of its top US executives – accountable for subjecting Ms. Gonzalez to egregious and shocking *quid pro quo* sexual harassment, sexual assault, hostile work environment, gender discrimination, retaliation, and wrongful termination.

2.    From the outset of her employment at Wipro in April 2023, Ms. Gonzalez (a accomplished young operations executive) was reduced to a sexual plaything by Mr. Oppenheimer, a much-older, high-powered male Wipro executive who she reported to and worked under.

3.    Mr. Oppenheimer subjected Ms. Gonzalez to constant on-the-job *quid pro quo* sexual demands, explicit sexual harassment and misconduct, and sexual assault. Ms. Gonzalez was ultimately terminated by Wipro in retaliation for opposing and reporting the depraved and unlawful conduct she endured.

4.    Immediately upon her hiring, Ms. Gonzalez became the target of Mr. Oppenheimer's harassment. Mr. Oppenheimer demanded that she provide personal "selfies" for his sexual gratification, repeatedly instructed her to "entertain" him, and explicitly conditioned her professional opportunities and advancement on her willingness to comply with his sexual demands.

5.    On April 18, 2023, during a Wipro-sponsored business trip in New York City, Mr. Oppenheimer sexually assaulted Ms. Gonzalez in an Uber following a meeting at Google (a major Wipro client). While intoxicated, he grabbed Ms. Gonzalez by the neck, forcibly kissed her, and attempted to grope her genitalia despite her resistance and pleas for him to stop. This was sexual assault under New York law.

2

6.      Ms. Gonzalez objected to the sexual assault and thereafter refused to continue complying with Mr. Oppenheimer's sexualized demands. In response to Ms. Gonzalez's opposition and protected activity, Wipro and Mr. Oppenheimer subjected Ms. Gonzalez to a campaign of retaliation. Mr. Oppenheimer immediately excluded Ms. Gonzalez from key meetings, sabotaged her work relationships, refused to communicate with her, and spread false and damaging information about her performance to senior leadership, and took other direct, intentional and malicious actions calculated to punish her for spurning him by preventing her from doing her job and harming her standing at the company.

7.      Ms. Gonzalez made multiple protected complaints to Wipro Human Resources and senior executives, reporting the sexual harassment, sexual assault, discrimination and retaliation she suffered at the hands of Mr. Oppenheimer. To support these protected complaints, Ms. Gonzalez provided corroborating evidence, including text messages reflecting Mr. Oppenheimer's sexualized demands and admissions.

8.       Rather than protect Ms. Gonzalez or comply with its own policies, Wipro conducted a sham investigation designed to exonerate Mr. Oppenheimer, disregarded the evidence, and sided openly with the perpetrator.

9.      On December 8, 2023, following months of retaliation, discrimination, and institutional betrayal, Wipro terminated Ms. Gonzalez's employment. Her termination was motivated by discriminatory and retaliatory animus, including her refusal to submit to Mr. Oppenheimer's sexual demands and her protected complaints of harassment, assault, and retaliation.

10. Wipro imposed no discipline whatsoever on Mr. Oppenheimer, who remained in his senior leadership role despite admitting to sexual misconduct, ratifying and giving its seal of approval to his outrageous conduct.

11. As a direct result of Defendants' unlawful conduct, Ms. Gonzalez suffered substantial harm, including severe emotional distress requiring treatment, reputational injury, diminished professional opportunities, and significant lost wages and benefits. She now brings this action to hold Wipro and Mr. Oppenheimer fully accountable for their discriminatory, retaliatory, negligent, and tortious actions.

## CLAIMS

12. Pursuant to the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., Ms. Gonzalez seeks to hold Defendants liable for sexual harassment, gender discrimination, a hostile work environment, and retaliation. Defendants subjected Ms. Gonzalez to repeated unwelcome sexual advances and harassment, *quid pro quo* sexual harassment, sexual assault, gender discrimination and retaliatory actions culminating in her unlawful termination. Ms. Gonzalez seeks declaratory, injunctive, and equitable relief, compensatory damages, punitive damages where available, and attorneys' fees and costs.

13. Pursuant to the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq., Ms. Gonzalez seeks to hold Defendants liable for treating her less well because of her gender, for subjecting her to a sexually hostile work environment, and for retaliation under the statute's broad and remedial standard. Ms. Gonzalez seeks declaratory, injunctive, and equitable relief, economic and compensatory damages, punitive damages, and attorneys' fees and costs.

14.    Ms. Gonzalez seeks to hold Defendant Oppenheimer liable for sexual assault, based on his non-consensual grabbing, groping, and forcible kissing of her during a work-related trip on April 18, 2023. Ms. Gonzalez seeks compensatory damages for emotional and psychological harm, as well as punitive damages based on the intentional, abusive, and egregious nature of Mr. Oppenheimer's conduct.

15.    Ms. Gonzalez seeks to hold Defendants Wipro Limited and Wipro, Inc. liable for negligent supervision and retention. Wipro knew or should have known of Oppenheimer's propensity to misuse his authority, sexually harass subordinates, and retaliate against employees who rejected or reported his misconduct. Despite this knowledge—and despite receiving corroborated evidence and admissions from Oppenheimer—Wipro failed to discipline, monitor, or remove him, thereby enabling his continued abuse of Ms. Gonzalez. Ms. Gonzalez seeks compensatory and punitive damages to the extent permitted by law.

16.    Pursuant to all applicable statutes and common-law principles, Ms. Gonzalez also seeks to hold Defendants liable for the economic and non-economic harms she suffered as a direct result of their illegal actions, including lost wages, lost bonuses, reputational harm, emotional distress, and diminished career advancement opportunities. Ms. Gonzalez additionally seeks recovery of attorney's fees and costs as provided for under the NYSHRL and NYCHRL, and to the extent available under New York common law.

## THE PARTIES

17.    Defendant Wipro Limited is an global information technology services and consulting corporation with more than 250,000 employees worldwide, including thousands within the United States.

5

18.     Defendant Wipro, Inc., a subsidiary of Defendant Wipro Limited, is a corporation incorporated in the state of Delaware.

19.     The United States headquarters and principal place of business of both Wipro Limited and Wipro Inc is at 2 Tower Center Boulevard, Suite 2200, East Brunswick, New Jersey 08816.

20.     Collectively, Defendant Wipro Limited and its subsidiary, Defendant Wipro, Inc. comprise a "single employer" for purposes of all applicable statutes. Defendants Wipro Limited and Wipro, Inc. have interrelated operations, centralized human resources and control of labor relations, common senior management, and common ownership and financial control. Wipro Limited holds overall managerial control and operational oversight, and provides human resources services for all US-based Wipro employees, including with respect to Ms. Gonzalez and her employment.

21.     Wipro maintains substantial business operations in New York City. Wipro operates an office located at 1115 6th Avenue, #3030, New York, NY 10036, at which at over 100 New York-based employees are employed by Wipro.

22.     Wipro Limited and Wipro, Inc Ms. Gonzalez's employer within the meaning of the NYSHRL and NYCHRL.

23.     Defendant Kenneth Oppenheimer ("Oppenheimer") is approximately 55 years old and a resident of Ohio. During the relevant period, he was employed by Wipro as its Vice President and Head of Global Strategy for Financial Services, a senior leadership position with substantial authority over Wipro's financial services business and personnel, including Ms. Gonzalez. Mr. Oppenheimer routinely conducted business in New York City during the period at issue and

committed pertinent acts towards Ms. Gonzalez, including sexual harassment and sexual assault, while physically present in New York City.

24.     Plaintiff Alexa Gonzalez ("Plaintiff" or "Ms. Gonzalez") is a 33-year-old woman and resident of New York. At all relevant times, Ms. Gonzalez was an employee within the meaning of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"). Ms. Gonzalez was hired by Wipro in April 2023 to serve as Chief of Staff, Business and Financial Services, working out of New York City, including out of Wipro's New York City office.

25.     At all relevant times, Defendant Oppenheimer exercised actual and apparent supervisory and managerial authority over Ms. Gonzalez, who reported to and worked under him. Mr. Oppenheimer's supervisory authority included the power to influence or determine her work and client assignments, professional development opportunities, internal and external relationships, access to leadership meetings, assessments of her performance and compensation, and other material terms and conditions of her employment.

26.     At all relevant times, Defendants acted directly or indirectly through their agents, employees, and representatives. Wipro is liable for the discriminatory, retaliatory, negligent, and tortious acts of its employees, including Defendant Oppenheimer, under theories of strict liability, respondeat superior, agency, proxy, actual and apparent authority, condonation/ratification, and negligent supervision and retention.

## JURISDICTION, VENUE AND ADMINISTRATIVE PREREQUISITES

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs:

7

a.  Plaintiff is a resident and citizen of New York;

b.  Defendant Wipro Limited, has a principal place of business in the United States in New Jersey and is incorporated in India;

c.  Defendant Wipro, Inc. has a principal place of business in New Jersey and is incorporated in Delaware;

d.  Defendant Oppenheimer is a resident and citizen of Ohio;

e.  Plaintiff seeks $16,000,000 in total; far in excess of the amount-in-controversy threshold for diversity jurisdiction.

28.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 to the extent any federal questions arise during the litigation and pursuant to 28 U.S.C. § 1367(a), which provides supplemental jurisdiction over Plaintiff's claims brought under the New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), and New York common law, as these claims arise from the same nucleus of operative facts.

29.    This Court has personal jurisdiction over Defendants because they conduct business in New York and committed tortious and discriminatory acts within the State and City of New York.

30.    Defendant Oppenheimer regularly traveled to and conducted business in New York City during the relevant period and thereafter, including the April 18, 2023 sexual assault. Defendant Wipro employs numerous individuals in New York City and routinely conducts business in this District.

31.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District, including:

8

a.  Plaintiff's work activities performed in New York, NY;

b.  the sexual harassment and *quid pro quo* demands made toward Plaintiff while she  worked in New York, NY;

c.  the gender discrimination and retaliation Plaintiff faced when she worked in New York.

d.  the April 18, 2023 sexual assault that occurred during a work-related trip in New York, NY.

32.    Venue is also proper in this District because Defendant Wipro maintains significant operations within New York City and the harms Plaintiff suffered—including sexual harassment, sexual assault, gender discrimination, retaliation, hostile work environment, termination, and the effect of these harms —were felt within this District.

33.    All statutory and administrative prerequisites to filing suit under the NYSHRL and NYCHRL have been satisfied or are not applicable.

## STATEMENT OF FACTS

### Background Of The Parties

34.    Ms. Gonzalez has spent most of her professional career as an operations executive at elite global financial institutions. After starting her financial services career at HSBC, Ms.Gonzalez was employed for approximately 8 years by Credit Suisse, successfully serving as Chief of Staff to several investment banking groups. Ms. Gonzalez has also worked at Apollo Global Management as Chief of Staff for the Data Engineering group. Ms. Gonzalez's track record of professional success as a woman in the high-pressure, male-dominated world of finance reflects her skills and work ethic.

35.     Wipro is an Indian multinational information technology services and consulting company with 250,000 employees and business partners around the world, including thousands of employees based in the United States. The US operations of Wipro are headquartered in East Brunswick, NJ.

36.     Mr. Oppenheimer is approximately 55 years old and a resident of Ohio. During the relevant period, Mr. Oppenheimer was employed by Wipro as the company's Vice President of Global Strategy for Financial Services. In this high-powered role, Mr. Oppenheimer was in charge of strategy and growth for clients in the financial services sector, including (without limitation) banks, investment firms, and insurance companies. Mr. Oppenheimer frequently visited New York City to conduct business, including numerous client meetings, events, and engagements.

37.     Ms. Gonzalez was hired by Wipro as Chief of Staff, Business and Financial Services in April 2023. In this New York City based role, Ms. Gonzalez reported to and worked under Mr. Oppenheimer, as well as Wipro Senior Vice President and Head of Banking and Financial Services Mahesh Raja.

38.     As Chief of Staff, Business and Financial Services, Ms. Gonzalez's role included working directly under Mr. Oppenheimer's oversight on strategic initiatives, projects, business development efforts and events involving large Wipro clients. Mr. Oppenheimer was responsible for assessing Ms. Gonzalez's performance in this critical area.

39.     Ms. Gonzalez's role also required frequent coordination with Mr. Oppenheimer and other executives of Wipro as to meetings, strategic initiatives, business development, events and otherwise; this function necessarily required Mr. Oppenheimer's cooperation.

**Wipro's "Global Policy On The Prevention of Sexual Harassment"**

40.    Wipro purports to abhor and prohibit sexual harassment in its workforce or any other aspect of its business operations around the world.

41.    Pursuant to Wipro's "Global Policy on Prevention of Sexual Harassment": *"Wipro is committed to providing a safe, non-discriminatory, non-hostile and harassment free work environment ... Wipro has zero tolerance to Sexual Harassment."*

42.    The policy contains an exceptionally broad definition of sexual harassment, as follows:

> *"Sexual harassment is inclusively defined as any unwelcome sexually determined behaviour (whether directly or by implication), that adversely impacts equality at work, dignity, and rights of employees, adversely impacts the health, confidence, morale, and performance of those affected."*

43.    Prohibited sexual harassment under the aforementioned policy includes, inter alia:

> **Physical acts:** *"Any unwelcome physical contact and advances (direct or indirect), verbal or non-verbal conduct of a sexual nature or using technology in a work environment."*

> **Quid Pro Quo Harassment:** *"Direct or implied requests by any person for sexual favours where it may become a term or condition of employment ... offers of favourable reviews, salary increases, promotions, continued employment, or other rewards."*

> **Verbal conduct:** *"Sexually coloured/implied (double meaning) remarks or jokes."*

11

> **Hostile work environment:** *"Where it creates an intimidating, hostile, humiliating or sexually-offensive work environment, and affects the mental health of the person."*

44.     Wipro's policy also forbids retaliation against sexual harassment complainants.

45.     As discussed hereinbelow, Wipro and Mr. Oppenheimer flagrantly violated this policy.

46.     Ms. Gonzalez suffered egregious sexual harassment, including a sexual assault, at the hands of Mr. Oppenheimer and was terminated by Wipro due to sexual harassment and gender discrimination and in retaliation for complaining about the way that Mr. Oppenheimer treated her.

47.     Wipro was aware of Mr. Oppenheimer's sexual harassment, sexual assault, and other discriminatory and retaliatory treatment. Nevertheless, in violation of its own policies, Wipro not only failed to address Mr. Oppenheimer's actions, but ratified the conduct and retaliated against Ms. Gonzalez for repeated protected complaints about the way she was treated.

## Ms, Gonzalez Is Sexually Harassed and Assaulted By Mr. Oppenheimer

48.     Upon commencing her employment with Wipro in April 2023, Ms. Gonzalez was naturally unsure about starting a new job, and intent on making a positive impression on her superiors in order to prove herself.

49.     Mr. Oppenheimer contacted Ms. Gonzalez promptly upon her hiring at Wipro. From the outset, Mr. Oppenheimer appeared unusually friendly and interested in getting to know Ms. Gonzalez. Mr. Oppenheimer took what was intended to be a business-focused conversation in a personal direction. Among other things, Mr. Oppenheimer brought up the fact that he is Jewish (as is Ms. Gonzalez). This interaction with Mr. Oppenheimer contrasted starkly with Ms. Gonzalez's initial conversations with other senior executives at Wipro, which were businesslike.

50.     Initially, Ms. Gonzalez was thrilled that an important Wipro VP such as Mr. Oppenheimer appeared to be taking an interest in her professional development and career. She hoped that Mr. Oppenheimer could boost her career and serve as a mentor and ally within Wipro.

51.     Mr. Oppenheimer requested Ms. Gonzalez's personal cell phone number, stating that he needed the number to communicate with Ms. Gonzalez about work-related issues.

52.     On April 12, 2023, Mr. Oppenheimer reached out to Ms. Gonzalez (who was working remotely) by text to ask whether she had received an email from Elias Ruvalcaba, a Wipro leadership team member.

53.     However, Mr. Oppenheimer quickly steered the conversation away from work, directing Ms. Gonzalez "U better save my number" and describing himself as "the most fun."

54.     Remarkably, without having even met Ms. Gonzalez, Mr. Oppenheimer then demanded that Ms. Gonzalez send him a "selfie," directing her: **"Picture now..let's go."**

55.     Ms. Gonzalez was taken aback by Mr. Oppenheimer's inappropriate request for a photograph of herself, responding "[o]f me?"

56.     Mr. Oppenheimer responded by confirming that he was directing Ms. Gonzalez to send him a selfie. Fearful of displeasing the high-powered VP if she did not comply, Ms. Gonzalez sent a selfie to Mr. Oppenheimer.

57.     On receiving the selfie, Mr. Oppenheimer responded by escalating his sexual harassment of Ms. Gonzalez.

58.     Mr. Oppenheimer expressed sexual arousal **("I like that one")** and demanded further selfies as Ms. Gonzalez changed her outfit ("**Keep sending as u change, it's fun**").

59.     Mr. Oppenheimer then remarked your "**Your job to entertain me**" which he followed up with "**u have to keep me entertained LOL**."



60.     In view of Mr. Oppenheimer's authority within Wipro as an influential VP and his statements regarding his ability to control the employment conditions and prospects of Ms. Gonzalez (a brand-new junior employee), his statement that Ms. Gonzalez's **"job"** was to **"entertain"** Mr. Oppenheimer – by sending him selfies that sexually aroused him – confirms that this was a case of *quid pro quo* sexual harassment.

61.     Mr. Oppenheimer made it clear that he viewed sexually gratifying him as a necessary part of Ms. Gonzalez's job duties. Mr. Oppenheimer frequently told Ms. Gonzalez that he would facilitate her attendance at high-level meetings, at which she could get to know senior Wipro leadership and top clients, and thereby establish herself at the company and angle for promotion. Mr. Oppenheimer emphasized to Ms. Gonzalez that if they "stuck together" he would benefit her career by facilitating her growth at Wipro and putting her in line for higher paying and more significant roles.

14

62.     Ms. Gonzalez was deeply uncomfortable at Mr. Oppenheimer's demands for pictures of her that he was using for sexual gratification purposes, and his accompanying lewd comments, but felt compelled to comply because she (as a junior female employees only a few days into the job) was intimidated by the high-powered male VP and because Mr. Oppenheimer promised her professional advancement in exchange for compliance with his sexual demands.



63.     Mr. Oppenheimer continued sexually harassing Ms. Gonzalez the following day (April 13, 2023), demanding to know "**Where my pic this am?**" Ms. Gonzalez responded to this demand by providing another selfie. Mr. Oppenheimer urged Ms. Gonzalez to produce more pictures.



64.    That evening, Mr. Oppenheimer inquired what Ms. Gonzalez was doing. When Ms. Gonzalez responded that, after a busy workday, she was "home in bed now : ) finalllyyyyy", Mr. Oppenheimer responded obscenely "**That's a good picture I'd like to see.**" Ms. Gonzalez was shocked by this ribald sexual remark and intentionally did not respond that evening in the hope that Mr. Oppenheimer would leave her alone.



65.    However, Mr. Oppenheimer continued to sexually harass Ms. Gonzalez with frequent and increasingly impatient demands for selfies on April 14, 2023, asking Ms. Gonzalez "**What's the outfit today**?" Ms. Gonzalez declined on the ground she was working from home in sweats, but Mr. Oppenheimer persisted in demanding selfies, directing Ms. Gonzalez to "**Show me:)**"

16



66.     Mr. Oppenheimer continued to badger Ms. Gonzalez for selfies as April 14, 2023 went on, showing impatience at Ms. Gonzalez's reluctance to do as he demanded. Ultimately, Ms. Gonzalez gave in to Mr. Oppenheimer's pressure and provided a selfie, to which he responded "**Gee took ya long enough**".

67.     Mr. Oppenheimer also persisted in texting Ms. Gonzalez lewd and improper comments, including by implying that he was fantasizing about Ms. Gonzalez in the shower and making a vulgar and offensive joke about sushi (an apparent reference to Ms. Gonzalez's genitalia) which he emphasized by declaring "**Selfies = Sushi**". Ms. Gonzalez was taken aback by these crude sexual remarks but continued to play along as she remained intimidated and worried that Mr. Oppenheimer would be displeased if she failed to do so.



68.    Mr. Oppenheimer was in New York City on April 17 and 18, 2023 for a business trip - specifically, a high-level meeting with Google, a large Wipro client. Mr. Oppenheimer told Ms. Gonzalez that she could attend the meeting in accordance with his assurances that if Ms. Gonzalez were to "stick" with him, she would get ahead at Wipro.

69.    Mr. Oppenheimer directed Ms. Gonzalez to meet him at the Marriott Marquis located at 1535 Broadway, New York, NY. Per Mr. Oppenheimer's directives and Ms. Gonzalez would thereafter travel together to the meeting.

70.    Ms. Gonzalez met Mr Oppenheimer and Mr. Ruvalcaba at the Marriott Marquis. Ms. Gonzalez was asked about her personal situation and advised that she had a boyfriend. This appeared to irritate Mr. Oppenheimer, who volunteered that he was single.



71.     The Google meeting, which was held over the course of multiple days, concerned Wipro's business with Google and the partnership between the two companies. It was held at Google's NYC headquarters, located in Chelsea, and was attended by high-level Google and Wipro personnel.

72.     Following the meeting, at Mr. Oppenheimer's invitation (which she felt pressured to accept) Ms. Gonzalez accompanied Ms. Oppenheimer for drinks at Brass Monkey, a bar in the Meatpacking District close to Google's NYC offices.

73.     While at Brass Monkey, Mr. Oppenheimer consumed several strong alcoholic drinks. Ms. Gonzalez only drank a moderate amount of wine.

74.     Ms. Gonzalez sought to use the gathering at Brass Monkey as a networking opportunity and thus endeavored to speak to as many Wipro and Google executives as possible and introduce herself to others present. However, throughout the event, Mr. Oppenheimer followed Ms. Gonzalez around and repeatedly inserted himself into conversations that she was having with others present.

75.     The gathering at Brass Monkey went on for about 3 hours. Thereafter, Mr. Oppenheimer ordered an Uber Share for Ms. Gonzalez and himself and stated that he would put the ride on the company credit card. Ms. Gonzalez felt compelled to go with the high-powered Wipro VP, particularly as the Uber ride was being financed by Wipro and was semi-official.

76.     The first stop of the Uber Share was the Marriott Marquis, Mr. Oppenheimer's destination, and the second stop was Ms. Gonzalez's residence, in Brooklyn at the time.

**77.     Upon the Uber arriving to the Marriott Marquis, with the car doors closed, Mr. Oppenheimer aggressively grabbed Ms. Gonzalez by her neck, forcibly kissed her**

mouth, then pushed his hand onto Ms. Gonzalez's thigh near her genitalia, attempting to force his hand towards her vagina.

78.    **While trying to grope Ms. Gonzalez, Mr. Oppenheimer demanded that she submit to him, saying "come on, come on".**

79.    **Ms. Gonzalez was shocked and disgusted at this sexual assault by the lecherous and much-older Mr. Oppenheimer and resisted him, attempting to get away. Ms. Gonzalez pleaded "Ken stop seriously."**

80.    This request that Mr. Oppenheimer cease his sexual assault of Ms. Gonzalez constituted protected opposition activity.

81.    Distraught about what had occurred, Ms. Gonzalez was in tears the entire way home.

82.    Traumatized by the incident, Ms. Gonzalez attempted to suppress her thoughts of it. Ms. Gonzalez was concerned that her career at Wipro would be over just weeks after it began if she were to formally report Mr. Oppenheimer's sexual harassment and assault of her to HR, or if she confronted Mr. Oppenheimer.

83.    At 11:22PM on April 18, 2023, Mr. Oppenheimer texted Ms. Gonzalez: "**I need a good selfie before bed.**" Mr. Oppenheimer's continuation of the sexual harassment and demands for selfies for purposes of sexual gratification angered Ms. Gonzalez, who remained distraught as a result of Mr. Oppenheimer's actions. Ms. Gonzalez ignored this latest inappropriate and harassing request for a selfie.

84.    The next day, April 19, 2023, after Ms. Gonzalez confirmed by not providing a selfie that she would no longer tolerate Mr. Oppenheimer's sexual harassment, Ms. Gonzalez was

informed that Mr. Oppenheimer had canceled her invitation to the Google event (which was ongoing) for that day at the last minute.

85.     Mr. Oppenheimer remained non-responsive to Ms. Gonzalez the following day, April 20, 2023. It was apparent from Mr. Oppenheimer's non-responsiveness that he was displeased by Ms. Gonzalez for rejecting his sexual advances and refusing to comply with his continued demands for selfies.

86.     Recognizing that Mr. Oppenheimer was retaliating against her for rejecting him sexually, Ms. Gonzalez texted Mr. Oppenheimer: "**I can read between lines. Didn't hear from you so in any case, take care & I'll speak to [your] business if we need to collaborate on anything.**" This comment constituted protected opposition activity; Ms. Gonzalez communicated to Mr. Oppenheimer again that she was not interested in him sexually and would no longer indulge his sexual fantasies.

87.     Confirming his animosity against Ms. Gonzalez for rejecting him sexually and objecting to his sexual harassment, Mr. Oppenheimer never responded to this comment (he only sent 1 further text to Ms. Gonzalez saying that he was busy).

**Ms. Gonzalez Suffers Retaliation and Unlawful Termination**

88.     As noted, Ms. Gonzalez sought to move past Mr. Oppenheimer's sexual harassment and the incident on April 18, 2023 and focus on her work.

89.     Ms. Gonzalez's efforts in this regard were deliberately sabotaged by Mr. Oppenheimer, who evidently remained infuriated at Ms. Gonzalez for spurning his sexual advances. Mr. Oppenheimer commenced a campaign of discriminatory and retaliatory actions intended to cost Ms. Gonzalez her job with Wipro.

90.     Mr. Oppenheimer refused to work with Ms. Gonzalez or even speak to her, even

21

when required for work. This was very damaging to Ms. Gonzalez because, as Chief of Staff, she was required to be in the loop with respect to all Banking and Financial Services client relationships.

91.    Ms. Gonzalez performed the work she was given effectively. However, her ability to do her job was impeded by the fact that Mr. Oppenheimer excluded her from projects with which he was involved.

92.    Mr. Oppenheimer deliberately excluded Ms. Gonzalez from meetings with important clients. Significantly, Mr. Oppenheimer excluded Ms. Gonzalez from calls with Microsoft and Google (major clients for which Ms. Gonzalez's attendance was a substantial part of her job as Chief of Staff). Ms. Gonzalez would not be invited to the calls, and would be told subsequently that "We already spoke to Ken about this." Ms. Gonzalez would frequently be humiliated in this fashion.

93.    Similarly, after Mr. Oppenheimer failed to tell Ms. Gonzalez that he met with a ServiceNow partner, Ms. Gonzalez was chastised by the partner for setting a duplicative meeting as she "had already spoken to Ken."

94.    Mr. Oppenheimer excluded Ms. Gonzalez from preparations from the AWS reInvent cloud computing event. Wipro is a Platinum sponsor of and major participant in this event given AWS's importance as a partner to Wipro. As Chief of Staff, Ms. Gonzalez was required to be involved in Wipro's extensive preparations – however, Mr. Oppenheimer (who had total control over Wipro's participation in the event) completely cut her out, keeping her off correspondence and out of meetings relating to the event.

95.     Upon information and belief, Mr. Oppenheimer falsely disparaged Ms. Gonzalez's performance to members internal management including Mr. Raja and other senior leadership team members and external stakeholders

96.     Ms. Gonzalez attempted to address Mr. Oppenheimer treatment of her directly with him in a professional manner, but he refused to even speak to her. Other senior leadership members were aware of Mr. Oppenheimer's discriminatory and retaliatory treatment of Ms. Gonzalez but did nothing to address it.

97.     Further demonstrating supervisory authority over Ms. Gonzalez (or, at a minimum, apparent supervisory authority), Mr. Oppenheimer also represented to Ms. Gonzalez that he possessed the authority to secure her prized assignments and ultimately advancement within Wipro (and was willing to use same if Ms. Gonzalez gratified him sexually).

98.     Mr. Oppenheimer was totally unresponsive to Ms. Gonzalez's attempts to communicate with him on Teams regarding work-related issues. Whenever Ms. Gonzalez would ask Mr. Oppenheimer to update her as to certain tasks and assignments, Mr. Oppenheimer would not respond. Mr. Oppenheimer would not respond to any communication from Ms. Gonzalez unless Mr. Raja was also present on the call.

99.     Other Wipro team members acting at Mr. Oppenheimer's direction similarly ignored and brushed off Ms. Gonzalez. Mr. Oppenheimer smeared Ms. Gonzalez to other management members including Mr. Raja and the HR Department.

100.     In September 2023, during an event at Wipro's US headquarters in New Jersey, Ms. Gonzalez was sitting with Wipro's Head of Marketing, Linda Cutler, Mr. Oppenheimer joined the table, greeting everyone except for Ms. Gonzalez, who he conspicuously ignored and refused

to speak to. Ms. Gonzalez was deeply embarrassed at Mr. Oppenheimer's public shunning of her in retaliation for her objection to his outrageous sexual harassment.

101.    During the same event, Mark Allen, Wipro VP and Global Head of Energy, Natural Resources, and Utilities Consulting informed Ms. Gonzalez that Mr. Oppenheimer (who – as noted – had informed her that he was single in April when pursuing her sexually, as noted above) was in fact married with children.

102.    Ms. Gonzalez made a protected complaint to Mr. Allen during the September 2023 event at Wipro regarding Mr. Oppenheimer's sexual assault and sexual harassment. Mr. Allen appeared shocked and sympathetic to Ms. Gonzalez, and expressed disgust at Mr. Oppenheimer's actions, stating "**ew, what a creep.**"

103.    Ms. Gonzalez was so humiliated by Mr. Oppenheimer's treatment of her that she was compelled to leave the event early to avoid the embarrassment of being publicly degraded and treated as worthless by Mr. Oppenheimer, her harasser.

104.    In October 2023, as a result of Mr. Oppenheimer's unlawful and retaliatory efforts to blackball and discredit Ms. Gonzalez for rejecting his sexual advances, and in retaliation for her protected complaints Wipro HR threatened to terminate Ms. Gonzalez's employment. Due to Mr. Oppenheimer's smears and baseless attacks on her performance, Wipro HR accused Ms. Gonzalez of "not pulling her weight".

105.    In October 2023, Ms. Gonzalez made a protected complaint regarding Mr. Oppenheimer's sexual harassment, discrimination and retaliation, and the sexual assault incident to Wipro SVP Mr. Raja. Mr. Raja professed that he was astounded about what had transpired, and apologetic about how Ms. Gonzalez had been treated by Mr. Oppenheimer.

106.    Ms. Gonzalez explained to Arpana Sidhu of Wipro HR that any perceived performance issues were the result of Mr. Oppenheimer's bias-driven and retaliatory campaign to get Ms. Gonzalez fired after she rebuffed his sexual advances and objected to his sexual harassment. Ms. Gonzalez formally complained to HR regarding Mr. Oppenheimer, reporting Mr. Oppenheimer's many requests for selfies, sexual advances, lewd and inappropriate comments, and the incident of April 18, 2023, and providing copies of her text message conversation with Mr. Oppenheimer as evidence.

107.    Ms. Sidhu advised that Wipro would investigate Ms. Gonzalez's complaint. Pending the investigation, Ms. Gonzalez was placed on administrative leave with pay.

108.    Instead of conducting the investigation in accordance with the Wipro "Global Policy on the Prevention of Sexual Harassment" or the law, Wipro conducted a fraudulent investigation with a preordained result in favor of Mr. Oppenheimer.

109.    Ms. Gonzalez was interviewed via Zoom as part of the investigation twice (in or about October and then November 2023) by Ms. Sidhu and another Wipro HR official. Ms. Gonzalez reiterated her sexual harassment, discrimination and retaliation protected complaints and directed Ms. Sidhu to the text messages and other supporting evidence (including Uber camera footage).

110.    In December 2023, Ms. Sidhu informed Ms. Gonzalez that Mr. Oppenheimer had denied engaging in any sexual harassment or retaliation, and with respect to the incident on April 18, 2023, that Mr. Oppenheimer claimed that he and Ms. Gonzalez kissed but alleged that this was consensual. Ms. Gonzalez objected to this denial (another protected complaint).

111.    On December 8, 2023, Ms. Sidhu informed Ms. Gonzalez that the investigation had concluded and that Wipro had decided to terminate her employment with the company. Wipro had decided to take the word of Mr. Oppenheimer over that of Ms. Gonzalez.

112.    The investigation was a predetermined **sham**.

113.    Notably, reflecting that the investigation was a predetermined sham rigged against Ms. Gonzalez, Wipro failed to follow the investigation procedures set forth in the Wipro Global Policy on Prevention of Sexual Harassment.

114.    Among other deviations, Wipro failed to consider evidence available to the company through Uber (i.e., surveillance footage), disregarded evidence, including the text messages provided by Ms. Gonzalez (which confirmed that Mr. Oppenheimer sexually harassed her) and evidence that Mr. Oppenheimer had ostracized Ms. Gonzalez after she spurned him, failed to provide Ms. Gonzalez the written response of Mr. Oppenheimer to her complaint, failed to conduct required hearings before an internal committee, and delayed the proceeding unduly.

115.    Wipro chose to disregard evidence (including the text messages cited above) confirming Mr. Oppenheimer had engaged in sexual harassment in violation of Wipro's own policies, as well as New York State and City law.

116.    Wipro likewise chose to give Mr. Oppenheimer a pass even though he admitted (at the very least) to engaging in sexual misconduct with a subordinate.

117.    Mr. Oppenheimer remained with Wipro following the termination of Ms. Gonzalez and received no discipline or sanction despite his reprehensible and illegal conduct. Wipro chose to shield Mr. Oppenheimer, ignoring his exploitation of his senior position in the company to facilitate sexual harassment and assault and then discriminate and retaliate against Ms. Gonzalez after she rejected him and refused to indulge his sexual fantasies.

118.    The decision to terminate Ms. Gonzalez was motivated by discriminatory and retaliatory animus towards Ms. Gonzalez. **Wipro fired Ms. Gonzalez for refusing to submit to the sexual demands of Mr. Oppenheimer and serve as his sexual plaything, and because she made protected complaints about the sexual harassment, sexual assault, discrimination, and retaliation she endured.**

119.    Due to Wipro and Mr. Oppenheimer's illegal actions, Ms. Gonzalez suffered severe emotional distress for which she continues to receive treatment, significant loss of wages and lasting damage to her professional career.

120.    Ms. Gonzalez reserves the right to amend this Complaint to add additional statutory or common-law claims as may be warranted following discovery or further factual development.

## CAUSES OF ACTION

## COUNT I — SEXUAL HARASSMENT, GENDER DISCRIMINATION & HOSTILE WORK ENVIRONMENT

### (New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.)

121.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

122.    Plaintiff is a woman and is therefore a member of a protected class under the NYSHRL.

123.    Defendant Wipro was Plaintiff's employer within the meaning of the NYSHRL.

124.    Defendant Oppenheimer was Plaintiff's supervisor with authority over the terms and conditions of her employment.

125.    The NYSHRL prohibits employers and supervisors from subjecting an employee to sexual harassment, gender discrimination, and a hostile work environment.

126.    Throughout her employment, Plaintiff was subjected to unwanted sexualized conduct by Mr. Oppenheimer, including demands for "selfies" for purposes of his sexual gratification, lewd comments, *quid pro quo* propositions, inappropriate personal remarks, and increasingly coercive sexual demands.

127.    Plaintiff was further subjected to a severe and pervasive hostile work environment, including egregious misconduct culminating in Mr. Oppenheimer's sexual assault of Plaintiff in New York City on April 18, 2023. A sexual assault is independently severe enough to create a hostile and abusive work environment and constitutes *per se* liability.

128.    Mr. Oppenheimer's conduct was unwelcome, illegal, and carried out by a high-ranking executive with direct supervisory power over Plaintiff, affecting the terms, conditions, and privileges of her employment.

129.    Plaintiff reasonably believed that her job, career advancement, and continued success at Wipro depended on her willingness to comply with Mr. Oppenheimer's sexualized demands, constituting *quid pro quo* sexual harassment.

130.    Defendant Wipro knew or should have known about the harassment and failed to take appropriate remedial action. Instead, Wipro ignored Plaintiff's complaints, disregarded corroborating evidence in including the text messages submitted by Plaintiff, and sided with Mr. Oppenheimer despite his admission of sexual misconduct.

131.    Where a *quid pro quo* harasser wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for quid pro quo harassment. Wipro is subject to strict liability for Mr. Oppenheimer's conduct because he engaged in *quid pro quo* sexual harassment.

132.    Employer liability under the NYSHRL is imputed when an employee uses his

apparent authority to facilitate discriminatory conduct. Wipro is subject to liability here because Mr. Oppenheimer's position and conduct created the appearance that he acted for Wipro, and his interactions with Ms. Gonzalez—including repeated sexual demands and the sexual assault following a work event in a Wipro-funded Uber—were shaped by his perceived power to affect her employment.

133.    Under the proxy theory, employer liability under the NYSHRL attaches where the discriminatory conduct is perpetrated by a high-level managerial employee who is viewed as the employer's proxy. Mr. Oppenheimer, a high-level managerial employee with significant control over company operations, would properly be considered a proxy for Wipro, making Wipro directly liable for his actions.

134.    Defendant Wipro also became a party to the discriminatory acts through condonation. Under the NYSHRL, condonation is a knowing, after-the-fact forgiveness or acceptance of an offense, and an employer's calculated inaction may indicate such condonation. Wipro's bad-faith investigation of Ms. Gonzalez's complaints demonstrates condonation. Wipro failed to follow its own Global Policy on Prevention of Sexual Harassment, disregarded corroborating text messages and available Uber surveillance footage, failed to provide Ms. Gonzalez with Mr. Oppenheimer's written response, and unduly delayed the process. Wipro further condoned the harassment by terminating Ms. Gonzalez while siding with Mr. Oppenheimer, openly stating it was taking his word over hers, and imposing no discipline on him despite his confirmed violations of company policy and admissions of misconduct.

135.    The unlawful conduct described above altered Plaintiff's working conditions and created a hostile and abusive working environment in violation of the NYSHRL.

136.    As a direct and proximate result, Plaintiff has suffered emotional distress,

reputational harm, financial loss, and other damages.

## COUNT II — RETALIATION

**(New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.)**

137.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

138.    Plaintiff engaged in protected activity when she objected to and complained about Mr. Oppenheimer's sexual harassment, sexual assault, and retaliatory behavior to Wipro HR and senior management.

139.    Plaintiff also engaged in protected activity when she resisted Mr. Oppenheimer's sexual assault on April 18, 2023 and told him, "Ken stop seriously."

140.    Following her protected complaints, Plaintiff was subjected to escalating retaliation by Mr. Oppenheimer, including exclusion from critical meetings, refusals to communicate with her, undermining her professional responsibilities, and spreading false information about her performance.

141.    Wipro is liable for Mr. Oppenheimer's retaliation because he used his apparent authority as a high-level executive to carry out these adverse actions, creating a clear nexus between his supervisory role and the harm inflicted upon Ms. Gonzalez.

142.    Mr. Oppenheimer was, at a minimum, a *de facto* supervisor whose retaliatory actions are imputable to Wipro.

143.    As a high-level managerial employee, Mr. Oppenheimer also acted as a proxy for Wipro, making his retaliatory conduct directly attributable to the company.

144.    Wipro further condoned Mr. Oppenheimer's retaliatory campaign through its calculated inaction and subsequent bad-faith investigation, which culminated in punishing the victim, Ms. Gonzalez, instead of the perpetrator.

30

145.    After Plaintiff made formal complaints to HR and produced corroborating text messages demonstrating harassment, Wipro further retaliated by placing her on administrative leave and conducting a sham investigation with a predetermined outcome.

146.    On December 8, 2023, Wipro terminated Plaintiff's employment in retaliation for her protected activity.

147.    Defendants' retaliatory actions violated the NYSHRL.

148.    Plaintiff suffered damages as a result, including emotional distress, lost wages, and other economic and non-economic harm.

## COUNT III — AIDING AND ABETTING UNDER THE NYSHRL

149.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

150.    The NYSHRL, N.Y. Exec. Law § 296 et seq. establishes that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

151.    A defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable as an aider and abettor under the NYSHRL. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995).

152.    In addition to direct liability, Defendant Oppenheimer is liable as an aider and abettor because he actually participated in the discriminatory conduct. Further, he aided and abetted Wipro's unlawful retaliatory termination by initiating and perpetuating a retaliatory campaign against Ms. Gonzalez and providing false and misleading justifications to HR that directly led to her firing.

153.    In addition to direct liability, Defendant Wipro is liable for aiding and abetting Defendant Oppenheimer's unlawful discrimination and harassment. Wipro's "calculated inaction" in response to the discriminatory conduct, its failure to take appropriate remedial action, its execution of a sham investigation, and its decision to credit the harasser over the victim constitute a "knowing, after-the-fact forgiveness or acceptance of an offense," thereby condoning and enabling Mr. Oppenheimer's conduct.

154.    As a direct and proximate result of Defendants' aiding and abetting of unlawful discriminatory and retaliatory practices, Plaintiff has suffered significant emotional, reputational, and financial damages.

## COUNT IV — SEXUAL HARASSMENT, GENDER DISCRIMINATION & HOSTILE WORK ENVIRONMENT
### (New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.)

155.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

156.    Plaintiff is a member of a protected class based on her gender, and Defendants are covered entities under the NYCHRL.

157.    Under the NYCHRL's liberal standard, discrimination is established if an employee is treated "less well" because of her protected characteristic.

158.    Mr. Oppenheimer treated Plaintiff less well than other employees by subjecting her to unwanted sexual attention, lewd commentary, coercive requests for photographs, sexualized demands tied to work opportunities, and other inappropriate conduct.

159.    The NYCHRL also prohibits gender-based harassment regardless of severity or pervasiveness where an employee is treated less well because of gender.

160.    Defendant Oppenheimer actually participated in the discriminatory and harassing

32

conduct alleged herein—including repeated sexualized demands, quid pro quo propositions, sexual assault, and related gender-based mistreatment—rendering him directly liable under the NYCHRL for discrimination, sexual harassment, and the creation of a hostile work environment.

161.    Mr. Oppenheimer's sexual assault of Plaintiff on April 18, 2023 independently constitutes unlawful gender-based violence and hostile work environment discrimination.

162.    The NYCHRL imposes strict liability on an employer for the discriminatory conduct of an employee or agent where the offending employee exercised managerial or supervisory responsibility. N.Y.C. Admin. Code § 8-107(13). Knowledge is automatically and irrebuttably attributed to the employer when the conduct is that of a manager, establishing vicarious liability

163.    Mr. Oppenheimer was, at a minimum, a *de facto* supervisor and/or had apparent authority as a supervisor, rendering Wipro liable.

164.    His position and actions created the appearance he spoke for Wipro, and Ms. Gonzalez's interactions—including his sexual demands and the assault following a work event in a Wipro-financed Uber—were shaped by his perceived power.

165.    Wipro is also liable under a condonation theory. Its sham investigation, which disregarded clear evidence of harassment and resulted in the termination of the victim rather than the harasser, constitutes a knowing, after-the-fact forgiveness or acceptance of an offense.

166.    Defendant Wipro failed to prevent or correct the harassment and retaliated against Plaintiff for opposing it, violating the NYCHRL.

167.    As a result, Plaintiff suffered substantial harm, including emotional distress, humiliation, and economic losses.

## COUNT V — RETALIATION

**(New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.)**

168.    Plaintiff re-alleges and incorporates all preceding paragraphs.

169.    Plaintiff engaged in protected activity by complaining to Wipro supervisors and HR about the sexual harassment, assault, and retaliation she endured.

170.    Wipro is strictly liable for Mr. Oppenheimer's retaliatory conduct, as he was, at a minimum, a *de facto* supervisor who exercised managerial or supervisory responsibility over Ms. Gonzalez. N.Y.C. Admin. Code § 8-107(13). His use of apparent authority to undermine her employment after she rejected him makes his retaliatory acts attributable to Wipro.

171.    Wipro also condoned the retaliation through its calculated inaction and bad-faith investigation, which ratified Mr. Oppenheimer's campaign to oust Ms. Gonzalez by siding with him and terminating her.

172.    Defendants retaliated against Plaintiff by excluding her from meetings, sabotaging her work performance, isolating her, undermining her authority, and ultimately terminating her employment.

173.    Such retaliation violates the NYCHRL's broad prohibition on adverse treatment in response to protected activity.

174.    Defendant Oppenheimer actually participated in, directed, and carried out the retaliatory acts described above—including excluding Ms. Gonzalez from key meetings, refusing to communicate with her about work, undermining her ability to perform her role, smearing her performance and professionalism to senior leadership and HR, and initiating and fueling the chain of events that culminated in her termination—and is therefore directly liable under the NYCHRL for retaliation in addition to Wipro's liability.

34

175.    Plaintiff suffered damages as a direct result, including emotional, reputational, and financial harm.

## COUNT VI — AIDING AND ABETTING UNDER NYCHRL

176.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

177.    Under the NYCHRL, it shall be an unlawful discriminatory practice for any person "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-107(6).

178.    In addition to direct liability, Defendant Wipro is directly liable under the NYCHRL for discrimination, hostile work environment, and retaliation.

179.    In addition to direct liability, Defendant Oppenheimer aided and abetted Wipro's NYCHRL violations by initiating, directing, and driving the discriminatory and retaliatory conduct that formed the basis of Wipro's liability, including repeated sexualized demands, quid pro quo harassment, the April 18, 2023 sexual assault, and the subsequent campaign of retaliation and exclusion after Plaintiff rejected his advances and complained.

180.    Wipro aided and abetted Oppenheimer's violations of the NYCHRL by failing to prevent or correct his misconduct, by engaging in calculated inaction in the face of Plaintiff's complaints, by conducting a sham investigation designed to exonerate him, and by terminating Plaintiff in retaliation for her protected activity, thereby inciting, compelling, and coercing the continuation and consequences of his unlawful acts.

181.    As a direct and proximate result of Defendants' aiding and abetting of unlawful discriminatory and retaliatory practices in violation of the NYCHRL, Plaintiff has suffered and continues to suffer significant emotional distress, reputational harm, and financial damages.

## COUNT VII — SEXUAL ASSAULT

**(Against Defendant Oppenheimer, New York Common Law)**

182.    Plaintiff re-alleges and incorporates all preceding paragraphs.

183.    On April 18, 2023, during a business-related Uber ride in New York City, Defendant Oppenheimer intentionally grabbed Plaintiff by the neck, forcibly kissed her, and attempted to grope her near her genitalia while ignoring her verbal resistance.

184.    Defendant Oppenheimer's non-consensual touching constitutes sexual assault and battery under New York common law.

185.    Plaintiff did not consent to any physical contact initiated by Defendant Oppenheimer.

186.    Defendant's conduct was intentional, harmful, offensive, and undertaken to satisfy his own sexual desires.

187.    As a direct result of the assault, Plaintiff suffered emotional trauma, fear, humiliation, and ongoing psychological harm.

## COUNT VIIII — NEGLIGENT SUPERVISION AND RETENTION
**(Against Defendants Wipro Limited and Wipro, Inc., New York Common Law)**

188.    Plaintiff re-alleges and incorporates all preceding paragraphs.

189.    Defendant Wipro owed Plaintiff a duty to exercise reasonable care in hiring, supervising, monitoring, and retaining employees, particularly high-level executives such as Mr.

Oppenheimer.

190.    Wipro knew or should have known that Mr. Oppenheimer posed an unreasonable risk of harm to female subordinates, including Plaintiff and that he had a propensity for the kind of conduct that he engaged in with respect to Plaintiff.

191.    Despite possessing evidence of misconduct—including text message evidence corroborating harassment and Mr. Oppenheimer's own admissions—Wipro failed to take corrective action and instead retained him without discipline.

192.    Wipro negligently failed to supervise Mr. Oppenheimer, enabling him to continue abusing his authority to harass, retaliate against, and harm Plaintiff.

193.    The sexual assault of Plaintiff by Mr. Oppenheimer occurred during a work event.

194.    Wipro's negligent supervision and retention were substantial factors in causing Plaintiff's injuries, including emotional distress, economic loss, and reputational harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants as follows:

-   **A declaratory judgment** that Defendants' conduct violated the New York State Human Rights Law, the New York City Human Rights Law, and New York common law through sexual harassment, gender discrimination, retaliation, hostile work environment, sexual assault, and negligent supervision and retention;

-   **An award of back pay under the NYSHRL and NYCHRL**, against Defendants, including lost wages, lost bonuses, lost benefits, and all other compensation Plaintiff would have earned but for Defendants' unlawful termination of her employment, in the amount of $1,000,000;

-   **An award of front pay under the NYSHRL and NYCHRL,** against Defendants, to compensate Plaintiff for future lost earnings and loss of career advancement resulting from Defendants' unlawful actions, in the amount of $3,000,000.

- **Compensatory damages**, against Defendants, for Plaintiff's emotional distress, mental anguish, humiliation, reputational damage, loss of enjoyment of life, and all other non-economic harm caused by Defendants' unlawful conduct, including the sexual harassment, sexual assault, hostile work environment, and retaliation she endured in the amount of $3,000,000;

- **An award of damages for sexual assault and battery** under New York common law against Defendant Oppenheimer, including emotional trauma, psychological harm, and all other injuries resulting from Defendant Oppenheimer's non-consensual physical contact in the amount of $1,000,000;

- **An award of damages for negligent supervision and retention** against Defendants Wipro Limited and Wipro, Inc. for failing to adequately supervise, discipline, or remove Defendant Oppenheimer despite knowledge of his misconduct and the foreseeable risk of harm he posed to Plaintiff, in the amount of $4,000,000;

- **Punitive damages**, against Defendants, to the fullest extent permitted under the NYSHR, NYCHRL, and applicable common law principles as Defendants acted willfully, maliciously, and with reckless disregard for Plaintiff's protected rights in the amount of $3,000,000;

- **Pre-judgment and post-judgment interest** at the maximum rates allowed by law;

- **An award of reasonable attorneys' fees, expert fees, and costs** pursuant to the NYSHRL, NYCHRL, and applicable common-law principles;

- **Such other and further relief** as the Court deems just, proper, and equitable under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated:        Huntington, NY
              December 21, 2025

                    Respectfully Submitted,
                    **TA LEGAL GROUP PLLC**

By: _____
                    Taimur Alamgir, Esq.
                    205 E Main Street, Suite 3-2
                    Huntington, NY 11743
                    Tel. (914) 552-2669
                    tim@talegalgroup.com
                    *Co-Counsel for Plaintiff Alexa Gonzalez*

                    **BROWN KWON & LAM**
                    William M. Brown, Esq.
                    521 Fifth Avenue,
                    17th Floor
                    New York, NY 10175
                    (718) 971-0326
                    wbrown@bkllawyers.com
                    *Co-Counsel for Plaintiff Alexa Gonzalez*